IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KARI A. GROHL, | ) | CASE NO. 5:25-cv-279 |
| | ) | |
| Plaintiff, | ) | DISTRICT JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Kari A. Grohl ("Plaintiff" or "Ms. Grohl") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and supplemental security income ("SSI"). (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

1

## I.        Procedural History

On February 4, 2021, Plaintiff filed an application for DIB and SSI.[1]  (Tr. 106, 117.)  She alleged a disability onset date of April 30, 2016.  (*Id.*)  She alleged disability due to Atrial fabulation ("afib") and high blood pressure ("hbp"), chronic obstructive pulmonary disease ("COPD"), sleep apnea, right knee replacement, and a right shoulder injury.  (Tr. 107-8.)  Plaintiff's application was denied at the initial level (Tr. 106, 117) and upon reconsideration (Tr. 128, 140), and she requested a hearing (Tr. 183-4).  On October 12, 2022, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 54.)

On November 22, 2022, the ALJ issued a decision finding that Plaintiff had not been under a disability within the meaning of the Social Security Act from April 30, 2016, through the date of the decision.  (Tr. 47-48.)  On September 20, 2023, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-7.)  Plaintiff sought judicial review, and the parties jointly sought remand for further proceedings.  (Tr. 880.)  On remand, the Appeals Council noted that the "hearing decision does not discuss whether claimant has a severe medically determined impairment concerning her cervical spine or fibromyalgia" and "does not discuss whether a cervical spine impairment or fibromyalgia would have any impact on claimant's residual functional capacity," and accordingly remanded the case to the ALJ with instructions to consolidate the case with subsequent DIB and SSI claims and:

- Further evaluate whether claimant's alleged cervical spine disorder and fibromyalgia are medically determinable and, if so, severe or non-severe; and

---

[1] Plaintiff previously applied for benefits in 2006, alleging disability in 2005 due to mental conditions.  (Tr. 94, 97.) In a 2008 decision, she was found not disabled.  (Tr. 105.)

- Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations.

(Tr. 895-97.)

On November 21, 2024, a second hearing was held before an ALJ.  (Tr. 821-47.)  On December 6, 2024, the ALJ issued a new decision finding Plaintiff not disabled from April 30, 2016 through the date of the decision.  (Tr. 792-811.)  The ALJ's decision became the Commissioner's final decision when Plaintiff did not file exceptions and the Appeals Council did not review her case on its own motion.  20 C.F.R. § 404.984.

On February 13, 2025, Plaintiff filed a Complaint challenging the Commissioner's final decision.  (ECF Doc. 1.)  The parties have completed briefing in the case.  (ECF Docs. 7, 9, 10.)

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Plaintiff was born in June 1975, and was 40 years old on the alleged disability onset date, making her a younger individual under Social Security Regulations at all relevant times.  (Tr. 809.)  She had at least a high school education.  (*Id.*)

### B.     Medical Evidence

#### 1.     Relevant Treatment History

Ms. Grohl injured her right knee at work in June 2011, and had right Patellofemoral replacement surgery on August 21, 2013.  (Tr. 361, 364.)

She sought care at Omni Orthopaedics in May 2016, and reported her knee pain had recently worsened, and was 7/10, was made worse by bending, standing, and walking, and was made better by sitting.  (Tr. 355.)  On examination, she walked with a "slightly antalgic gait," and had intact strength, sensation to light touch, and no instability in her right knee.  (Tr. 356-7.)  Right knee range of motion was 0 degrees of extension to 120 degrees of flexion.  (*Id.*)  Dr.

3

Brian Blake observed "Patellar crepitus of the right knee, but no atrophy, deformity, ecchymosis or effusion of the right knee. No swelling of the right knee. Tenderness of the right medial joint line, but no tenderness of the right popliteal fossa, lateral joint line, head of the fibula, lateral femoral condyle or medial femoral condyle." (*Id*.) Dr. Blake assessed her patellofemoral replacement as "stable," and noted she was "developing some adjacent compartment arthritis" in her right knee. (Tr. 357.)

In July 2017, Ms. Grohl returned to Dr. Blake after she "twisted her knee with medial pain and increased swelling in the past week." (Tr. 363.) She reported her pain was now 8/10, and was she was having difficulty walking up and down stairs, but was "self employed, regular duty." (Tr. 361.) On examination, her right knee had intact strength, stability, and full range of motion. (Tr. 362.) A review of x-rays showed her knee replacement was stable, with "mild medial joint line tenderness small medial osteophyte formation." (Tr. 363.) Dr. Blake ordered a Knee Neoprene Support Compression Sleeve. (*Id*.)

Ms. Grohl established care with cardiologist Dr. Amjad Iqbal at the Advanced Cardiovascular Center on October 2017. (Tr. 425.) Dr. Iqbal noted she had no prior history of cardiac disease, but had mildly elevated cholesterol and blood pressure. (*Id*.) She complained of back pain radiating to her check and down her arm, dizziness, and lightheadedness. (*Id*.) Her blood pressure was 162/80 and she was put on a lisinopril for high blood pressure. (Tr. 425-6.)

At a follow up with Dr. Iqbal on November 7, 2017, her examination results were normal and her blood pressure was better controlled with lisinopril at 124/78. (Tr. 428.) Dr. Iqbal continued lisinopril and referred her for a sleep study due to her complaints of snoring and family history of sleep apnea. (*Id*.)

4

Ms. Grohl returned to Omni Orthopaedics on July 27, 2017, after twisting her knee. (Tr. 363.) She was given a short-term prescription for pain medication and a compression knee brace to wear at work to help support her knee. (*Id*.)

On January 23, 2018, Ms. Grohl established care with pulmonologist Dr. Vishal Sawhney, on a referral from Dr. Iqbal for sleep issues. (Tr. 494-95.) On examination, Dr. Sawhney noted normal ambulation, heart rate and rhythm, and respiration, but with nasal congestion, obesity, and anxiety. (Tr. 496.) He recommended a CPAP titration study to assess sleep apnea, and assessed allergic rhinitis and anxiety. (Tr. 497.) He noted she was under stress from her work as a home health aide and family caregiving responsibilities, prescribed Bupropion for smoking cessation, and also counseled her on smoking cessation, the importance of physical activity, and dietary changes. (*Id*.)

Ms. Grohl returned to Dr. Iqbal on May 10, 2018 for a follow up. (Tr. 430.) He noted she had been found to have "severe sleep apnea" and was not on a CPAP. (*Id*.) Her cardiovascular evaluation and pulse were regular, with her blood pressure mildly elevated to 142/92. (Tr. 431.) Dr. Iqbal increased her lisinopril dosage and added Imdur. (*Id*.) He also noted her high salt intake and continued smoking. (*Id*.)

On May 23, 2018, Ms. Grohl returned to Dr. Sawhney and reported she was "doing well" on her CPAP and felt better wearing it "most every night." (Tr. 490-2.) Bupropion was helping with her depression, but she was still smoking half a pack a day. (Tr. 492.) Examination results were normal, except for nasal congestion, obesity, and anxiety. (*Id*.) Dr. Sawhney continued Bupropion, and ordered a CXR and PFT to assess Ms. Grohl's dyspnea on exertion. (Tr. 497.)

On September 11, 2018, Dr. Iqbal noted "She is doing well from cardiovascular standpoint. No chest pain or shortness of breath. No palpitations. She has felt much better since she is on CPAP and amlodipine. She has a lot more energy. Overall feels well."  (Tr. 434.)  Ms. Grohl's examination results were normal, with a blood pressure of 130/80.  (Tr. 434-35.)

Dr. Sawhney next saw Ms. Grohl on December 11, 2018, when she reported she had "slowed down on smoking and bought a vape."  (Tr. 484-87.)  She was wearing her CPAP every night, but was having trouble with it.  (Tr. 487.)  Examination results were normal, except for nasal congestion, obesity, and anxiety.  (*Id*.)  The CXR and PFT test results were normal. (Tr. 488.)  Dr. Sawhney proscribed Proair HFA, Serevent Diskus, and Spiriva for her dyspnea on exertion, buspirone for anxiety, loratadine for her allergic rhinitis, omeprazole for chronic cough, and continued Bupropion for smoking cessation.  (*Id*.)

Ms. Grohl returned to Dr. Blake on December 18, 2018, reporting she had twisted her knee and had increased pain over the past few weeks. (Tr. 364.)  She was "currently working part time, regular duty."  (*Id*.)  On examination, Dr. Blake noted a "slight antalgic gait" and her right knee range of motion was 0 degrees of extension to 120 degrees of flexion.  (Tr. 365.)  X-rays showed her knee replacement remained stable, "without evidence of loosening or complication. Some degenerative changes [were] noted in the medial compartment with subchondral sclerosis and small osteophyte formation no acute findings."  (Tr. 366.)  Dr. Blake prescribed Tylenol with Codine for short-term use only.  (*Id*.)

Ms. Grohl returned to Dr. Iqbal on April 12, 2019, reporting that she had recently gone to the emergency room after experiencing chest pains.  (Tr. 436.)  She complained of chronic shortness of breath, and continued smoking.  (*Id*.)  Her blood pressure remained controlled at

124/72 and examination results were normal.  (Tr. 437.)  Dr. Iqbal provided reassurance and continued her medications. (*Id*.)

On June 13, 2019, Ms. Grohl sought care at an ambulatory care clinic for upper back and neck pain.  (Tr. 608.)  X-rays of her left shoulder showed "mild acromioclavicular degenerative changes, otherwise no acute abnormalities."  (*Id*.)  Her examination results were in the normal range, with "[t]enderness to palpation of neck and upper back, spinal and paraspinal regions."  (Tr. 611.)  She was referred to physical therapy, and advised to use Tylenol and an over the counter rub like icy hot for muscular pain.  (*Id*.)

Ms. Grohl returned to Dr. Iqbal on November 13, 2019, and he noted that her episodes of palpitations were related to severe stress.  (Tr. 438.)  Her blood pressure remained well-controlled, with blood pressure at 136/80 and resting heart rate at 73 beats per minute.  (Tr. 438-9.)  Examination results were normal, including clear lungs despite continued smoking.  (Tr. 440.)  Dr. Iqbal continued her medications and again urged her to quit smoking.  (*Id*.)

On January 28, 2020, Ms. Grohl initiated care with Dr. Jeffrey Cochran at Tri County Orthopedic Surgeons after slipping and falling in her bathtub ten days earlier.  (Tr. 415.)  She reported right shoulder and neck pain and limited range of motion.  (*Id*.)  On examination, she had some tenderness over the right trapezius and posterior deltoid, strength and sensation in her upper extremities was normal, and she had full range of motion in her right shoulder and neck. (*Id*.)  An x-ray of her cervical spine showed mild degenerative changes at C4-5, 5-6 and 6-7. (Tr. 416.)  An x-ray of her shoulder showed no abnormalities.  (*Id*.)  Dr. Cochran assessed right shoulder impingement syndrome, and offered her a muscle relaxant. (*Id*.)  He advised her to stay strong and active, and to avoid bed rest.  (Tr. 417.)

When Ms. Grohl returned to Dr. Iqbal on February 25, 2020, he noted she was "doing well from a cardiovascular standpoint," although she reported palpitations and feeling like her heart was racing "most of the day." (Tr. 442.) He noted her heart rate was normal, and blood pressure was 122/82. (Tr. 442-43.) He ordered a Holter monitor and exercise perfusion scan to follow up on the reported palpitations. (Tr. 444.) On March 11, 2020, an upper extremity arterial study had normal results. (Tr. 466.) A 24-hour Holter monitor was performed on March 12, 2020, and findings were "Mildly abnormal … demonstrating rare isolated PVC" with no abnormal rhythms, brady arrhythmias, atrioventricular blocks, or pauses noted. (Tr. 459.) The perfusion scan, performed the same day, was normal. (Tr. 462.)

When Ms. Grohl saw Dr. Iqbal on September 14, 2020, she reported palpitations and a racing heart. (Tr. 446.) Her examination results were normal, with a blood pressure of 114/79 and clear lungs. (Tr. 448.)

Ms. Grohl followed up with Dr. Cochran regarding her shoulder and neck pain on November 20, 2020, reporting her symptoms had worsened. (Tr. 411.) Dr. Cochran noted no decrease in strength, which was still 5/5 in all upper extremities, and full range of motion, although with pain. (Tr. 411-12.) He ordered an MRI, and again advised her to stay strong and active, and to avoid bed rest. (Tr. 412.)

Ms. Grohl saw CNP Richele Smart at Advanced Cardiovascular Center on December 16, 2020, after "an overall feeling of being unwell and palpitations" caused her to seek care at the Mercy Medical Center Emergency Department. (Tr. 449.) At the hospital, her "workup including chest x-ray and EKG was entirely normal." (*Id*.) On examination, her blood pressure was 118/74, her lungs were clear, and other findings were normal. (Tr. 450-51.) CNP Smart started her on flecainide. (*Id*.)

On December 18, 2020, Ms. Grohl returned to Dr. Cochran to review her recent MRI. (Tr. 410.)  On examination, she continued to have full strength and range of motion, but pain with movement of her right shoulder.  (*Id.*)  The MRI showed moderate AC joint arthrosis, and possible tendinosis.  (Tr. 411.)  Dr. Cochran recommended giving her shoulder more time, while remaining strong and active and avoiding bed rest.  (*Id.*)

At a follow up on January 13, 2021, CNP Smart noted that it was not possible to tell if the Flecainide was effective at that time because Ms. Grohl had been under significant stress which caused her symptoms to return.  (Tr. 453.)  Ms. Grohl returned on February 10, 2021, and reported that she did not feel that her palpitations were well controlled, but acknowledged that she continued to be under significant stress.  (Tr. 456.)  On examination, her blood pressure was 130/86, and heart rate was 56.  (Tr. 458.)  CNP Smart increased her dosage of Flecainide, added Wellbutrin, and also offered a nicotine patch kit to help her quit smoking.  (*Id.*)

On January 19, 2021, Ms. Grohl returned to Dr. Cochran and asked to discuss surgical options, explaining that her cardiologists had cleared her for surgery.  (Tr. 401.)  While she retained full strength and range of motion in her upper extremities, she continued to experience pain with movement of her right shoulder.  (*Id.*)  Dr. Cochran again advised her to remain strong and active, and avoid bed rest.  (Tr. 402.)

On March 10, 2021, Ms. Grohl saw pulmonologist Dr. Eric Arbogast, a colleague of Dr. Sawhney.  (Tr. 479.)  She reported that her sleep had been improving, but she was having trouble getting her CPAP supplies.  (Tr. 482.)  Examination results were normal, including normal gait, motor strength and tone, and movement, except for nasal congestion, obesity, and anxiety.  (*Id.*)  Her medications were unchanged.  (Tr. 483.)

On May 7, 2021, Ms. Grohl met with Dr. Daniel Moretta of Tri County Orthopedic Surgeons for a 6-week follow up after a March 23, 2021 right shoulder arthroscopy.  (Tr. 639.) She reported no improvement in her symptoms, and had not begun physical therapy.  (*Id*.)  On examination, she had full strength and sensation in her upper extremities, but somewhat limited range of motion due to pain.  (*Id*.)  Dr. Moretta emphasized the importance of engaging in physical therapy to increase her range of motion, and advised her to stay strong and active, avoiding bed rest.  (Tr. 640.)  He issued a note that she could return to work with no restrictions on May 8, 2021.  (Tr. 638.)

At an orthopedic follow up on June 11, 2021, Dr. Moretta noted "Clinically, the patient is doing phenomenal with full strength and range of motion, however she has subjective discomfort of the AC joint and subjective weakness with arm flexion."  (Tr. 634.)  She had only completed three physical therapy sessions, and Dr. Moretta advised her to complete the full six weeks of physical therapy prescribed, with three sessions per week.  (Tr. 634-35.)

On January 14, 2022, Ms. Grohl returned to Dr. Cochran for a recheck of her right shoulder, reporting "she has not improved much since surgery."  (Tr. 626.)  She had not continued her physical therapy because she felt it made her symptoms worse.  (*Id*.)  X-ray imaging of her shoulder showed changes due to the surgery, but her joint space appeared well-maintained.  (Tr. 627.)  Dr. Cochran advised she return to physical therapy, stay strong and active, and avoid bed rest.  (*Id*.)

On April 26, 2022, Ms. Grohl returned to Dr. Cochran for a recheck of her right shoulder, again reporting "she has not improved much since surgery."  (Tr. 619.)  She said she had ended physical therapy after one month because she felt it made her symptoms worse, and the appointments conflicted with her family caregiving responsibilities.  (*Id*.)  Her right upper

extremity was mildly weak compared to the left, and her range of motion was limited in internal rotation but "otherwise essentially full."  (Tr. 619-20.)  Dr. Cochran gave her injections to help with pain and advised her to continue home band exercises to work on strength in her right shoulder.  (*Id*.)

Ms. Grohl established care with a new primary care provider, Dr. Alaa Al Saif, on May 11, 2022.  (Tr. 644.)  She had been dismissed as a patient by her prior primary care provider due to missed visits, which she attributed to illness.  (*Id*., Tr. 707.)  She believed she had fibromyalgia due to "really bad body pain everyday and on going," as well as a family history. (Tr. 644.)  Her depression screening was positive for depression, and she was under stress due to a death in the family, and her recent divorce.  (Tr. 645-46.)  She was using a CBD vape nightly to manage her pain.  (Tr. 647.)  On examination, Dr. Al Saif noted normal results except for joint tenderness.  (Tr. 650.)  Ms. Grohl was referred to pain management for fibromyalgia.  (Tr. 652.)

Ms. Grohl returned to Dr. Al Saif a month later, on June 15, 2022, to review her abnormal mammogram results and get a pelvic exam.  (Tr. 654-57.)  Dr. Al Saif assessed the abnormalities as likely benign and advised her to return in six months.  (*Id*.)

On August 18, 2022, Ms. Grohl was seen by pain management specialist Dr. David Paul Gutlove for neck and fibromyalgia pain.  (Tr. 682.)  On examination, she had 5/5 strength, "fairly normal" gait, "some discomfort," slightly diminished cervical range of motion, and multiple trigger points.  (*Id*.)  Dr. Gutlove ordered a neck MRI and lidocaine infusions for fibromyalgia.  (*Id*.)

Ms. Grohl saw Christopher Fogarty, APRN, CNP, for an initial evaluation in the Cleveland Clinic Mercy Hospital Psychiatry department on September 6, 2022. (Tr. 776.)  Her mental status examination results were normal, and CNP Fogarty noted she had "dysthymia

11

secondary to ongoing, persistent grief from her mother's death 1.5 years ago," with "few healthy coping skills." (Tr. 779.)  He assessed anxiety with depression, added Zoloft to her buspirone, recommended a daily walk, and referred her to a grief therapy group and for ADHD testing. (Tr. 767-69.)

On September 9, 2022, Ms. Grohl began receiving lidocaine infusions for her neck and fibromyalgia pain. (Tr. 708.)  She had follow up infusions approximately every month through May 13, 2024. (Tr. 722, 1137, 1139, 1145, 1146, 1147, 1149, 1219, 1220, 1226, 1232, 1233, 1235, 1253, 1336, 1354, 1359, 1361.)  She reported they were effective, relieving 50% to "nearly 100%" of her pain, and generally lasted for 3 to 4 weeks. (*Id.*)

Ms. Grohl returned to CNP Fogarty on October 18, 2022. (Tr. 745.)  She reported Zoloft made her feel "cloudy" and "Weird," and it was discontinued. (*Id.*)  She had not contacted the grief counseling group or scheduled ADHD testing. (*Id.*)  Her mental status examination results were in the normal range. (Tr. 747.)  CNP Fogarty assessed anxiety with secondary diagnoses of complicated grief and moderate depression. (Tr. 748.)  He increased her dosage of buspirone to 15 mg and referred her to a grief therapy group and individual therapy. (*Id.*)

At a cervical spine MRI on October 21, 2022, the impression was mid cervical congenital canal narrowing with superimposed disc/joint degeneration, spinal cord impingement without edema/myelomalacia from C4 through C7, and joint degeneration related multilevel bony foramina narrowing detailed level by level. (Tr. 729-30.)

On December 21, 2022, Ms. Grohl attended a neurosurgical evaluation with Dr. Enyinna Nwachuku. (Tr. 1255.)  She reported neck pain, arm pain and numbness, low back pain, and pain, numbness, and weakness in both lower extremities. (Tr. 1256.)  Dr. Nwachuku ordered

physical therapy, and recommended a cervical epidural spine injection.  (Tr. 1146.)  Ms. Grohl received a cervical epidural spine injection on February 22, 2023.  (Tr. 1143.)

Ms. Grohl returned to Dr. Nwachuku on April 19, 2023.  (Tr. 1255.)  Her findings on examination were normal, including normal gait and ability to ambulate without assistance, and full strength in all extremities.  (Tr. 1258.)  Her MRI showed spinal degeneration (spondylosis) causing narrowing (stenosis).  (Tr. 1255.)  She was advised that surgical options could be considered if she quit smoking and lost weight.  (Tr. 1259.)  Dr. Nwachuku recommended aqua physical therapy, a cervical epidural injection for symptom relief, smoking cessation, weight loss, and ordered a CT of her cervical spine.  (*Id*.)

At an April 26, 2023 lidocaine infusion appointment, Dr. Gutlove noted Ms. Grohl had "some discomfort," normal gait, and full strength in her upper extremities.  (Tr. 1254.)  The range of motion of her cervical spine was diminished in terms of rotation lateral tilt, and he noted "[m]ultiple trigger points tender points."  (*Id*.)

At a May 4, 2023 checkup with Dr. Sawhney, Ms. Grohl reported she was still smoking, had a new CPAP machine but was using it irregularly, and requested a new mask.  (Tr. 1152-6.)  Examination results were normal, including normal motor strength, gait, and movement of all extremities, except for obesity, sinus congestion, and anxiety.  (Tr. 1155.)  Dr. Sawhney refilled her loratadine, reordered her CPAP supplies, prescribed Ventolin for her shortness of breath, and recommended restarting bupropion and a nicotine patch.  (Tr. 1156.)  She did not want a referral to a psychiatrist.  (Tr. 1157.)

Ms. Grohl had an evaluation for physical therapy on May 12, 2023.  (Tr. 1245.)  PT Matthew Noel noted that she was unable to do an internal rotation with her right shoulder and had moderate limitation and increased pain in both her cervical extension AROM and lumbar

13

flexion, but otherwise indicated that she had minimal or no limitations in movement on functional examination. (Tr. 1247-8.) Her gait was independent and she needed no assistive device, although PT Noel observed a wide base of support and flexed trunk posture. (Tr. 1248.) Ms. Grohl never returned to initiate the planned therapy. (Tr. 1249.)

On May 18, 2023, Ms. Grohl sought care from Dr. Al Saif, reporting she had fallen twice in the past three months. (Tr. 1243.) Her examination results were normal, except for obesity. (Tr. 1244.) Dr. Al Saif prescribed a cane, walker and shower chair. (*Id.*)

When Ms. Grohl returned to Dr. Al Said on September 22, 2023, he noted that she was using a walker. (Tr. 1229.) Her examination results were normal, except for obesity and her use of a walker. (Tr. 1229.) Dr. Al Saif noted normal range of motion, including in her cervical back, and noted her neck was supple. (*Id.*)

Ms. Grohl saw Dr. Al Saif again on January 9, 2024, when she reported using a walker at times; her gait was normal on examination. (Tr. 1338-40.) At follow up visits with Dr. Al Saif on May 14, 2024, and July 17, 2024, Ms. Grohl's examination findings included normal gait, normal range of motion, including in her cervical back, and a supple neck. (Tr. 1358, 1596.) In response to a screening question at the July 17 appointment, Ms. Grohl stated that she had not fallen twice in the last year. (Tr. 1598.)

On October 21, 2024, Ms. Grohl had an initial psychiatric evaluation at ARC Psychiatry with Sally Dingman, APRN. (Tr. 1503.) Her mental status findings were normal, including a "steady" gait, except that APRN Dingman noted her sad affect, which she found appropriate since Ms. Grohl was grieving the recent losses of her husband, sister, and dog. (Tr. 1508-09.) APRN Dingman assessed depression, generalized anxiety disorder, PTSD, and ADHD. (Tr. 1510.) She increased Ms. Grohl's Cymbalta dose, and referred her for therapy. (*Id.*)

2.      **Opinion Evidence**

i.      **Consultative Examinations**

On September 9, 2021, Brian Griffiths, Psy.D., performed a psychiatric evaluation of Ms.

Grohl as part of her disability application.  (Tr. 575.)  Based on a clinical interview and review of

file information, Dr. Griffiths diagnosed an unspecified depressive disorder and an unspecified

trauma or stress-related disorder.  (Tr. 579.)  He concluded that Ms. Grohl may have "difficulty

mentally focusing if she is not interested in the subject matter," and opined that "depression

and/or trauma symptoms like avoidant behaviors and hypervigilance may interfere with Ms.

Grohl's ability to keep up with others."  (Tr. 580.)  Further, he opined that "Ms. Grohl's remarks

suggested that stressful situations might trigger trauma symptoms like avoidant behaviors and

hypervigilance. [and] intensify and magnify her depression."  (Tr. 581.)

ii.      **State Agency Consultants**

On May 13, 2021, state agency medical consultant Lynne Torello, M.D., reviewed the

record and opined that Plaintiff could: occasionally lift or carry 50 pounds; frequently lift or

carry 25 pounds; stand or walk and sit 6 hours out of an 8 hour work day; never climb ladders,

ropes, or scaffolds; occasionally crawl; and frequently reach overhead with her right arm.  (Tr.

112-13.)  On February 20, 2022, state agency medical consultant Leon Hughes, M.D., reviewed

the record and concurred with the earlier opinion of Dr. Torello.  (Tr. 134-35.)

On September 23, 2021, state agency psychological consultant Michael Cremerius,

Ph.D., reviewed the record and opined that Plaintiff had the following mental RFC limitations:

capable of performing simple and detailed tasks, but not complex tasks; limited to brief and

superficial interaction with coworkers, supervisors and the public; and capable of adapting to

typical changes, but no fast-paced tasks with strict production quotas. Variable paced tasks with

end of the day production quotas would be acceptable.  (Tr. 113-15.)  On February 17, 2022, state agency psychological consultant Audrey Todd, Ph.D., reviewed the record and concurred with the opinion of Dr. Cremerius.  (Tr. 135-37.)

**C.**     **Hearing Testimony**

   **1.**     **Plaintiff's Testimony**

At a hearing on November 21, 2024, Ms. Grohl testified that she lives alone in an apartment.  (Tr. 827.)  She has a driver's license and can drive, except when her legs and feet go numb.  (Tr. 828.)  A friend comes and helps her with chores like sweeping, mopping, and vacuuming, but she can still do chores like dusting and cleaning the bathroom.  (*Id*.)  For the past couple of weeks, her niece had come over to help her wash her hair because it was causing her hands to go numb.  (Tr. 828-29.)  Her hands were numb all the time, but she could still feel a little bit sometimes.  (Tr. 829.)  Three or four times a week her hands were so numb that she could not use them.  (Tr. 830.)  She had been receiving lidocaine infusions for her pain for a couple of years.  (*Id*.)  They helped relieve the pain 100% at first, but the effect wore off over the course of a month.  (*Id*.)  She could not drive for 24 hours after receiving an infusion, and was instructed not to do anything for 48 hours after receiving the infusion.  (Tr. 836.)

She used a walker at the hearing, and explained she used the walker on outings and used a cane at home and on trips to her doctor's office.  (Tr. 831-32.)  She could walk for 10 or 15 minutes with the cane.  (*Id*.)  At the grocery store, she used a cart.  (*Id*.)  Her son helped carry her groceries because her doctor advised her not to lift more than a gallon of milk.  (Tr. 832.)  Her last outing was taking her niece trick-or-treating.  (*Id*.)  She could usually sit for 30 to 45 minutes before she needed to get up and move.  (*Id*.)  If she sat too long, her legs would go numb.  (Tr. 834.)  She also used a shower chair.  (Tr. 839.)  Driving to the hearing made her very anxious

because it is unfamiliar territory.  (Tr. 840.)  On the day of the hearing, Ms. Grohl said she woke

around 6, took her dog out, showered, and then had to lie down to relieve her pain for 15 to 20

minutes in order to be able to finish dressing. (Tr. 834.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified that a hypothetical individual of Plaintiff's age,

education, and work experience, with the functional limitations described in the ALJ's RFC

determination, could perform representative positions in the national economy, including

document preparer, addresser, and eyeglass frame polisher.  (Tr. 841-43.)  The VE also testified

that the individual could miss up to two days of work per month and maintain a job, so long as

the individual was not absent on a routine basis.  (Tr. 843-44.)  If the hypothetical individual

"would require a walker for all periods of ambulation," the VE testified that would require an

accommodation by the employer.  (Tr. 844.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments

depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental
> impairment or impairments are of such severity that he is not only unable to do his previous
> work but cannot, considering his age, education, and work experience, engage in any other
> kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy. *Id.*

## IV.     The ALJ's Decision

In his December 6, 2024 decision, the ALJ made the following findings:[3]

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501, et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (*i.e.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[3] The ALJ's findings are summarized.

1.      The claimant meets the insured status requirements of the Social Security Act through March 31, 2019.

2.      The claimant has not engaged in substantial gainful activity since April 30, 2016, the alleged onset date.

3.      The claimant has the following severe impairments: obesity, fibromyalgia, degenerative disc disease of cervical spine, hypertension, obstructive sleep apnea, osteoarthritis of the right knee, status-post patellar replacement, osteoarthritis of the right shoulder, status-post arthroscopic repair, depressive disorder, and post-traumatic stress disorder.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.      The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she cannot climb ladders ropes or scaffolds. She can frequently climb ramps and stairs. She can frequently balance, stoop, kneel, crouch and occasionally crawl. She cannot reach overhead, but can frequently handle, finger, and feel. She should avoid concentrated exposure to fumes, odors, gases, and pulmonary irritants. She can attend to and carry out simple and some detailed tasks. She can occasionally interact with supervisors, coworkers, and the public. She can have interactions with coworkers and the public of a brief and superficial nature and no tasks of a fixed pace outside the individual's control (for example assembly line work). She can have infrequent changes in a setting or duties that are explained or demonstrated in advance.

6.      The claimant is unable to perform any past relevant work.

7.      The claimant was born in June 1975 and was 40 years old, defined as a younger individual age 18-44, on the alleged disability onset date.  The claimant subsequently changed age category to a younger individual age 45-49.

8.      The claimant has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including document preparer, addressor, and polisher.

(Tr. 792-811.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from April 30, 2016, through the date of the decision on December 6, 2024.  (Tr. 811.)

## V.     Plaintiff's Arguments

Ms. Grohl raises three assignments of error.  First, she asserts that the ALJ failed to properly apply SSR 96-8p and consider all of her impairments and related limitations when determining her RFC.  (ECF Doc. 7, pp. 1, 9-12.)  Second, she argues the ALJ failed to comply with the prior Order of Remand because he did not properly evaluate her fibromyalgia symptoms.  (*Id.* at pp. 1, 12-16.)  Third, she argues the ALJ erred when he found she did not require a cane or walker for ambulation.  (*Id.* at pp. 1, 17-19.)

## VI.     Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)); *see also Blakley*, 581 F.3d at 406. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d at 654 ("Generally, … we review decisions of administrative agencies for harmless error."). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and

logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**     **First Assignment of Error: The ALJ Adequately Considered Plaintiff's Non-Severe Medically Determinable Impairments When Assessing the RFC at Step Four**

In her first assignment of error, Ms. Grohl argues that the ALJ did not properly apply Social Security Ruling 96-8p because he "erroneously failed to include any limitations related to" Ms. Grohl's non-severe impairments of "chronic obstructive pulmonary disease, low back pain, anxiety, and ADHD" in the RFC.  (ECF Doc. 7, pp. 9-12.)  She also asserts that the ALJ erred by failing to discuss or consider the effects of her migraine headaches.[4]  (*Id.* at pp. 11-12.) The Commissioner responds that the ALJ considered all of Ms. Grohl's medically determinable impairments—severe and non-severe—in assessing the RFC, and included RFC limitations that could account for limitations stemming from those impairments.  (ECF Doc. 9, pp. 10-12.)

Social Security Ruling 96-8p provides that "[t]he RFC assessment must be based on all of the relevant evidence in the case record," explaining:

> In assessing [the] RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim.

SSR 96-8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34477 (July 2, 1996).  The Sixth Circuit also recognizes that an ALJ must consider "the combined effect of all of the claimant's impairments without regard to whether any such

---

[4] Ms. Grohl does not challenge the ALJ's failure to identify migraine headaches as a "medically determinable impairment" at Step Two of the sequential analysis.  Because she has not developed or clearly articulated such a challenge, she has waived any challenge to the ALJ's failure to designate her migraine headaches as medically determinable.  *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.").

impairment, if considered separately, would be of sufficient severity to render the claimant disabled." *Walker v. Sec'y of Health & Human Servs.*, 980 F.2d 1066, 1071 (6th Cir. 1992). The undersigned will address each of the impairments highlighted by Plaintiff in turn.

### 1.    The ALJ Properly Accounted for Plaintiff's Non-Severe COPD

In support of her argument that the ALJ erred by failing to include limitations related her chronic obstructive pulmonary disease (COPD) in the RFC, Ms. Grohl highlights her COPD diagnosis and periodic complaints of dyspnea on exertion.  (ECF Doc. 7, p. 10.)  But the ALJ acknowledged her diagnosis, subjective complaints, and related clinical findings in his decision. First, at Step Two, the ALJ explained his reasons for finding her COPD non-severe:

> The cardiologist noted the claimant had chronic obstructive pulmonary disease. However, she continued smoking and vaping and using Marijuana (C33F). The examinations of the claimant showed her lungs were clear to auscultation. She had no edema in her extremities (C10F: C35F). Thereafter in 2022 the claimant continued smoking and said she would become short of breath. She had some wheezing with productive cough. The examination of the claimant showed her lungs were clear to auscultation. She was provided medication for bronchitis. However, she was not using Spiriva. She was using her inhaler two to three times a day. The pulmonologist recommended a new medication for her symptoms. She was told to repeat a pulmonary function test (C15F). However, she did not have the pulmonary function test. Furthermore, thereafter her breathing was stable on Ventolin (C29F). In 2024, the examination of the claimant indicated she had normal breath sounds. She had no wheezing, rhonchi or rales (C35F).

(Tr. 796 (emphasis added).)  Although the ALJ found COPD did not have more than a minimal effect on Ms. Grohl's physical or mental functioning, he explicitly stated that he had considered all of the non-severe impairments in the RFC.  (Tr. 797.)

At Step Four, the ALJ adopted a sedentary RFC that found Plaintiff "should avoid concentrated exposure to fumes, odors, gases, and pulmonary irritants." (Tr. 800.)  In support, the ALJ provided a detailed summary of Ms. Grohl's treatment records, including her treatment with pulmonology for obstructive sleep apnea, her complaints of shortness of breath and other symptoms, and her continued smoking.  (*See, e.g.,* Tr. 801 ("the claimant continued to smoke"

but "denied having any syncope, dizziness, or lightheadedness"); *id.* ("the claimant had shortness of breath" but "continued to smoke"); Tr. 802 (she "stopped using her CPAP" and "continued smoking cigarettes against advice from her pulmonologist"); *id.* (she "denied any lightheadedness, dizziness" and "continued to smoke a half a pack of cigarettes per day"); 804 (she "was told to stop smoking"); *id.* (she "had not used her CPAP in over a year" and "reported dizziness" but "was still smoking"); *id.* (she "was using her CPAP but not nightly" and "continued to vape"); *id.* (she "was using the CPAP nightly" but "was smoking and vaping"); 805 (she "needed to stop smoking"); *id.* ("there was no evidence she stopped smoking"); *id.* (she "was prescribed Wellbutrin to stop smoking" and "was taking Wellbutrin for smoking cessation"); 807 (she "was smoking a pack of cigarettes per day and using Marijuana nightly").)

Thus, the ALJ acknowledged Ms. Grohl's COPD diagnosis and complaints of shortness of breath, but also noted her unremarkable clinical findings and continued smoking and vaping against medical advice; he found her COPD to be non-severe, but also stated that he considered it in assessing the RFC; and he ultimately adopted an RFC that included pulmonary limitations.  In this context, the undersigned finds Plaintiff has not met her burden to show that the ALJ failed to consider her non-severe COPD in assessing the RFC at Step Four.

### 2.  The ALJ Properly Accounted for Plaintiff's Non-Severe Low Back Pain

In support of her argument that the ALJ erred by failing to include limitations related her low back pain in the RFC, Ms. Grohl highlights a diagnosis of chronic low back pain with bilateral sciatica and her periodic complaints of low back pain and associated numbness.  (ECF Doc. 7, p. 10.)  At Step Two, the ALJ addressed her low back pain as follows:

> The claimant testified she had "low back pain." However, there was no evidence the claimant received any treatment for this condition. She did not receive any lumbar imaging. Nevertheless, her back pain was considered in the residual functional capacity set forth below.

(Tr. 796.) Although he found Ms. Grohl's untreated low back pain did not have more than a minimal effect on her physical or mental functioning, he explicitly stated that he had considered that impairment in the RFC. (Tr. 796-97.)

At Step Four, the ALJ adopted a sedentary RFC with limited climbing and limited balancing, stooping, kneeling, crouching, and crawling. (Tr. 800.) In support, he acknowledged Plaintiff's complaints of numbness in her legs, feet, and hands, her complaints of pain in her neck and body, her reported limitations in sitting, standing, and walking, and her treatment records for her fibromyalgia pain and her cervical impairments. (Tr. 801, 804-05.) Given the ALJ's recognition of Ms. Grohl's low back pain at Step Two, his statement that he considered that condition in assessing the RFC, his discussion of symptoms and treatment analogous to his alleged low back pain at Step Four, and his ultimate adoption of a sedentary RFC with climbing and postural limitations, the undersigned finds Plaintiff has not met her burden to show that the ALJ failed to consider her non-severe low back pain in assessing the RFC at Step Four.

### 3. The ALJ Properly Accounted for Plaintiff's Non-Severe Anxiety and ADHD

In support of her argument that the ALJ erred by failing to include RFC limitations relating to her non-severe anxiety and ADHD, Ms. Grohl highlights her own subjective complaints of anxiety, a diagnosis of anxiety, and two records indicating she was prescribed medication for her anxiety. (ECF Doc. 7, p. 10.) She also argues that the cited records "contradict[] the ALJ's specific statement that she did not receive medication for her anxiety." (*Id.* (citing Tr. 736, 796).)

But the ALJ acknowledged Plaintiff's diagnoses, subjective complaints, and related clinical findings in his decision. First, at Step Two, the ALJ explained why he found her anxiety and ADHD non-severe:

> In 2024, the claimant had a psychiatric assessment and was diagnosed with generalized anxiety disorder and attention deficit hyperactivity disorder, insomnia, and cannabis use. However, the claimant did not receive any medication for these conditions from the psychiatrist (C33F).

(Tr. 796.)  Although the ALJ found the impairments did not have more than a minimal effect on Ms. Grohl's physical or mental functioning, he explicitly stated that he had considered all of the non-severe impairments in the RFC.  (Tr. 797.)

At Step Three, the ALJ found that Ms. Grohl had mild limitations in understanding, remembering, and applying information and moderate limitations in: interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing himself.  (Tr. 799.)  In doing so, he repeatedly acknowledged Ms. Grohl's complaints of anxiety; but he also considered Ms. Grohl's clinical findings and extensive reported activities of daily living.  (*Id.*)

At Step Four, the ALJ adopted a limited mental RFC that found Plaintiff could: attend to and carry out simple and some detailed tasks; occasionally interact with supervisors, coworkers, and the public; have brief and superficial interactions with coworkers and the public; perform no tasks with a fixed pace outside of her control; and adapt to infrequent changes in a setting or duties that were explained or demonstrated in advance.  (Tr. 800.)  In support, the ALJ acknowledged Ms. Grohl's complaints of depression, anxiety, and post-traumatic stress (Tr. 801) and provided a detailed summary of her treatment records, including: her reports of improved depression in response to medications she used to stop smoking (Tr. 805); clinical findings at the consultative examination that were positive for depression and memory issues but negative for anxiety (Tr. 806); reports of extensive activities of daily living that included caring for others and managing her household (*id.*); reports of improved depression with medication (*id.*); the denial of Plaintiff's request for Ritalin for difficulty concentrating because "she was 'abusing marijuana'" (Tr. 807); her decision to discontinue psychiatric treatment in 2023 (*id.*); her complaints of

26

anxiety, depression, and post-traumatic stress symptoms at a psychiatric evaluation in late-2024 (*id.*); normal mental status findings at that same evaluation (*id.*); and her brief attendance at counseling and medication management before failing to return for further treatment (*id.*).

Despite the ALJ's discussion of Plaintiff's subjective complaints, diagnoses, treatment modalities, clinical findings, and reported activities of daily living, as summarized above, Ms. Grohl suggests that the ALJ erred when he failed to acknowledge that Ms. Grohl was prescribed Buspar for her anxiety in 2022.  (ECF Doc. 7, p. 10 (citing Tr. 735-36).)  She argues that this 2022 prescription "contradicts the ALJ's specific statement that she did not receive medication for her anxiety."  (*Id.*)  But the statement she references was a more limited (and accurate) observation that APRN Dingman did not prescribe medication for Plaintiff's anxiety or ADHD at a October 2024 psychiatric evaluation.  (Tr. 796 ("However, the claimant did not receive any medication for these conditions from the psychiatrist.") (citing Tr. 1502-80).)  Consistent with that statement, APRN Dingman's records reflect that she increased Plaintiff's existing Cymbalta prescription at the October 2024 evaluation (Tr. 1510), restarted Cymbalta at a lower dose in November 2024 (Tr. 1531), and did not provide further treatment.

Although the ALJ did not specifically discuss the Buspar prescription, he did recognize that Ms. Grohl received pharmaceutical treatment for her mental health impairments that included Wellbutrin, Zoloft, Cymbalta, and Xanex, and noted that a provider refused a request for Ritalin. (Tr. 806-7.)  It is well established that an ALJ need not "discuss each piece of data in [his] opinion, so long as [he] consider[s] the evidence as a whole and reach[es] a reasoned conclusion."  *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per

curiam)).  Here, the undersigned finds that the ALJ's discussion adequately addressed the record as a whole, even though it did not include specific discussion of the record cited by Plaintiff.

As a whole, the record reflects that the ALJ acknowledged Ms. Grohl's anxiety and ADHD diagnoses and her associated complaints of anxiety and difficulty with concentration, but also noted her largely unremarkable clinical findings, her limited treatment, and several occasions of treatment noncompliance, before he adopted a mental RFC that acknowledged significant limitations in Plaintiff's ability to interact, concentrate, persist, and adapt to changes. In this context, the undersigned finds Plaintiff has not met her burden to show that the ALJ did not appropriately consider her non-severe anxiety or ADHD in assessing the RFC at Step Four.

### 4.      The ALJ Was Not Required to Address Plaintiff's Migraine Headaches

Ms. Grohl states "[i]t should be noted" that the ALJ did not mention migraine headaches in his decision, even though Plaintiff was reportedly diagnosed with migraines at the time of her prior disability determination in 2008.  (ECF Doc. 7, p. 11 (citing Tr. 97 (finding migraines to be a non-severe impairment).)  Plaintiff also highlights three more recent medical records where she reports migraine headaches.  (*Id.* (citing Tr. 477 ("Reports her blood pressure is often elevated when she is getting a migraine & it also causes nausea."), Tr. 1169 (presents with "complaints of a longstanding history of neck pain and posterior migraines"), Tr. 1252 (review of symptoms includes "[o]ccasional migraine headaches")).)  However, Plaintiff does not identify any records showing a diagnosis or treatment for migraine headaches during the alleged disability period.

At Step Two, an ALJ must determine whether the impairments alleged by a claimant are "medically determinable."  20 C.F.R. § 404.1508.  A medically determinable impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques, and must be established by

medical evidence consisting of signs, symptoms, and laboratory findings.  *See id.; Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 698 (6th Cir. 2006).  Only evidence from an "acceptable medical source," such as a medical doctor, can establish a medically determinable impairment. 20 C.F.R. § 404.1513(a).  Plaintiff bears the burden of demonstrating that her impairments are both "severe" and "medically determinable" at Step Two.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004) (citing 20 C.F.R. § 404.1520(a)(4)(ii)); *see also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).  Here, Ms. Grohl has not challenged the ALJ's failure to find her migraine headaches "medically determinable" at Step Two, nor has she identified evidence that would support a finding that her migraines are medically determinable.

When an ALJ is assessing an RFC, he "must consider only limitations and restrictions attributable to medically determinable impairments."  SSR 96-8p, 61 Fed. Reg. at 34476.  As SSR 96-8p explains, "[t]he RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms."  *Id.* at 34475.  Here, where the ALJ did not find Ms. Grohl's migraine headaches to be medically determinable impairments and Ms. Grohl has not otherwise demonstrated at they are medically determinable, Plaintiff's argument that the ALJ erred by failing to consider migraine headaches in assessing the RFC must accordingly fail.[5]

For the reasons set forth above, the undersigned concludes that the ALJ appropriately considered the limitations imposed by Plaintiff's medically determinable impairments— including her non-severe COPD, low back pain, anxiety, and ADHD—in assessing the RFC, but

---

[5] Because the ALJ need not consider Plaintiff's non-medically-determinable migraine headaches in assessing the RFC, the undersigned does not address the Commissioner's additional argument that "the ALJ did consider [Plaintiff's] reports of headaches in assessing the RFC."  (ECF Doc. 9, p. 12.)

was not required to consider limitations imposed by impairments that were not established to be medically determinable—such as her migraine headaches. Accordingly, the undersigned finds the first assignment of error is without merit.

**C.      Second Assignment of Error: The ALJ Complied with the Order of Remand**

In her second assignment of error, Ms. Grohl argues that the ALJ erred by failing to follow the Appeals Council Order remanding the prior ALJ decision. (ECF Doc. 7, pp. 12-16.) After observing that the prior decision did not discuss whether Plaintiff had "a severe medically determined impairment concerning her cervical spine or fibromyalgia" or whether the cervical spine impairment or fibromyalgia would have an effect on Plaintiff's RFC, the Appeals Council remanded the matter with instructions for the ALJ to:

- Further evaluate whether claimant's alleged cervical spine disorder and fibromyalgia are medically determinable and, if so, severe or non-severe; and

- Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations.

(Tr. 895-6.) Ms. Grohl argues that the ALJ's new decision "once again fail[s] to adequately evaluate Plaintiff's fibromyalgia and/or cervical spine disease." (ECF Doc. 7, p. 13.) The Commissioner argues in response that the ALJ complied with the order of remand by finding Plaintiff's fibromyalgia to be both medically determinable and severe. (ECF Doc. 9, p. 12.)

Ms. Grohl's challenge appears focused on the Appeals Council's second instruction, that the ALJ give further consideration to Plaintiff's RFC in light of the evidence relating to her fibromyalgia and/or cervical spine disease. Specifically, Ms. Grohl asserts that the ALJ erred in considering her fibromyalgia pain. (ECF Doc. 7, pp. 13-16.) The Commissioner responds that the ALJ considered Plaintiff's subjective reports of fibromyalgia pain but appropriately found the allegations to be inconsistent with the evidence in the record. (ECF Doc. 9, pp. 13-15.)

As a general matter, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476; *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed Reg. 49462, 49463 (Oct. 25, 2017) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).  Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  *See* SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities. *See* SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.

In undertaking the second step analysis, an ALJ should consider objective medical evidence, a claimant's subjective complaints, information about a claimant's prior work record, and information from medical and non-medical sources.  SSR 16-3p, 82 Fed. Reg. 49462, 49464-49466; 20 C.F.R. § 404.1529(c)(3).  Factors relevant to a claimant's symptoms include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  SSR 16-3p, 82 Fed. Reg. at 49465-49466; 20 C.F.R. § 404.1529(c)(3).

Here, the ALJ acknowledged Ms. Grohl's subjective complaints of numbness in her hands and feet, neck pain, fibromyalgia pain, use of a walker, shoulder pain while reaching overhead, and limitations in sitting, standing, and walking, but concluded that "the claimant's

statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record," explaining that the evidence did not support Ms. Grohl's assertion that "she could not perform sedentary work." (Tr. 801.)  As to fibromyalgia in particular, the ALJ considered Ms. Grohl's request to be tested for fibromyalgia in 2019 "due to constant pain" (Tr. 802), her request for a referral to pain management for fibromyalgia in 2022 (Tr. 804), the May 2022 assessment where she was diagnosed with fibromyalgia, advised to have a Lidocaine infusion, and referred for further treatment of her fibromyalgia pain (*id.*), and her Lidocaine infusions for fibromyalgia pain in September, October, November, and December 2022 and January, February, March 2023, and thereafter (Tr. 804-05)  While the ALJ stated generally that Ms. Grohl's "fibromyalgia pain continued to remain under control with prescribed treatment," he noted more specifically that:

- Plaintiff reported her pain was down to zero after her December 2022 Lidocaine infusion (Tr. 805 (citing Tr. 1147));

- In January 2023, Plaintiff reported a 50% to 75% benefit after the December 2022 infusion that lasted ten to fourteen days (*id.* (citing Tr. 1146));

- In January 2023, Plaintiff reported improvement in her neck, shoulder, and upper back pain and reduction in the numbness in her hands and feet (*id.*);

- In February 2023, Plaintiff reported an 80% benefit for her fibromyalgia pain that lasted ten to fifteen days (*id.* (citing Tr. 1145));

- In March 2023, Plaintiff reported a nearly 100% ongoing benefit for generalized fibromyalgia pain, but not a benefit to her neck pain from the Lidocaine infusions, although she did have a 65% benefit in her neck pain and related symptoms after having her first cervical epidural injection in February 2023 (*id.* (citing Tr. 1139));

- In April 2023, Plaintiff again reported a nearly 100% ongoing benefit for her fibromyalgia pain after her March 2023 infusion (*id.* (citing Tr. 1137)); and

- "Thereafter, claimant continued to have Lidocaine infusions with good response for treatment of her fibromyalgia" (*id.* (citing Tr. 1214-1381, 1444)).

The ALJ also considered the medical opinion evidence, including the opinions of the state agency medical consultants that Ms. Grohl could perform medium exertional work, but found those opinions "not persuasive," concluding: "[t]he evidence indicated the claimant could only perform sedentary work due to her right shoulder, right knee, fibromyalgia, and cervical pain." (Tr. 808-09.)  Having considered the subjective complaints, clinical findings, treatment records, and medical opinions, the ALJ also considered Ms. Grohl's activities of daily living, explaining:

> despite her symptoms, the claimant was able to take care of her husband who received Social Security Disability. She spends time caring for her dog. She performed household chores and ran errands. She watched television and used her phone. She would occasionally visit her son. She checks in on her father. She interacted with one friend and would get together and talk. She can attend to her own hygiene, manage finances and prepare simple meals and grocery shop. She would drive.

(Tr. 806 (citing Tr. 575-81).)  Thus, the ALJ considered the factors set forth in SSR 16-3p and clearly articulated how he considered the evidence of record in making his findings.

Ms. Grohl argues that the ALJ erred in his analysis of her complaints of fibromyalgia pain because he "detailed Plaintiff's treatment for fibromyalgia but incorrectly concluded that since the pain continued to remain under control, it was not disabling."  (ECF Doc. 7, p. 13.)  In support, she highlights her diagnoses, her monthly Lidocaine infusions, and her testimony that her hands were numb all the time, that her fibromyalgia pain started to come back two to three days after an infusion, and that she was limited in her ability to do anything for 24-48 hours after an infusion.  (*Id.* at pp. 13-14.)  The Commissioner responds that the ALJ acknowledged Plaintiff's testimony but gave numerous reasons to support his finding that her subjective complaints were inconsistent with the evidence, including her improvement with Lidocaine infusions and her reported activities of daily living.  (ECF Doc. 9, p. 13.)

The undersigned agrees that the ALJ's written analysis appropriately acknowledges Ms. Grohl's subjective complaints of fibromyalgia pain and numbness and demonstrates that the ALJ considered the whole record, based his findings on relevant factors, and provided "specific reasons for the weight given to the individual's symptoms."  SSR 16-3p, 82 Fed. Reg. 49462, 49467.  The ALJ considered Plaintiff's subjective complaints, her positive but not complete improvement with Lidocaine infusions, and her participation in various activities of daily living before determining that her impairments supported a reduction to sedentary exertional work but did not support her assertion that she could not perform sedentary work.  (Tr. 801-09.)  Plaintiff has not met her burden to show that these findings lack the support of substantial evidence.

Ms. Grohl also argues that the ALJ's findings are flawed because he stated in error that Plaintiff received Lidocaine infusions "every three months."  (ECF Doc. 7, pp. 14-15 (citing Tr. 798).)  Here, she refers to the ALJ's finding at Step Three that her fibromyalgia did not meet a musculoskeletal listing or SSR 12-2p because Plaintiff "received trigger point injections and Lidocaine infusions every three months, which she consistently indicated improved her pain." (Tr. 798.)  But Ms. Grohl does not challenge the ALJ's findings at Step Three, and it is undisputed that the ALJ accurately characterized the treatment records at Step Four when he described Ms. Grohl's monthly Lidocaine infusion treatment records from September 2022 through March 2023 in detail.  (*See* Tr. 804-05.)  Given the detailed and accurate characterization of the treatment records at Step Four, the potential misstatement in the Step Three analysis does not deprive the ALJ's RFC findings of the support of substantial evidence.

Ultimately, the question before this Court is not whether there is evidence in the record to support Ms. Grohl's preferred findings.  Even if a preponderance of the evidence supports a finding that Ms. Grohl's subjective complaints are credible, this Court cannot overturn the ALJ's

finding to the contrary "so long as substantial evidence also support[ed] the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.

For the reasons set forth above, the undersigned concludes that the ALJ appropriately addressed Ms. Grohl's subjective complaints regarding her fibromyalgia pain in accordance with the regulatory requirements articulated in SSR 16-3p, that the ALJ's findings were supported by substantial evidence, and that Ms. Grohl has not met her burden to demonstrate otherwise. Accordingly, the undersigned finds Ms. Grohl's second assignment of error is without merit.

**D.  Third Assignment of Error: Substantial Evidence Supported the ALJ's Decision Not to Require Use of a Cane or Walker in the RFC**

In her third assignment of error, Ms. Grohl asserts that the ALJ erred at Step Four because he "erroneously failed to include the need for an assistive device in his RFC." (ECF Doc. 7, p. 18.)  She argues that a hand-held assistive device was medically required in this case, consistent with the requirements of SSR 96-9p.  (*Id.*)  She also asserts that the alleged error is harmful because the VE testified that use of a walker would require an accommodation.  (*Id.*)  The Commissioner argues in response that the record in this case does not include sufficient "medical documentation" to support a finding of medical necessity.  (ECF Doc. 9, pp. 15-16.)

The Sixth Circuit has explained that a hand-held assistive device "cannot be considered an exertional limitation" for purposes of an RFC if it "was not a necessary device for claimant's use." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002).  Under Social Security Ruling ("SSR") 96-9p, an ALJ may only "find that a hand-held assistive device is medically required" if the record contains "medical documentation" that: (1) "establish[es] the need for a hand-held assistive device to aid in walking or standing"; and (2) "describe[s] the circumstances for which [the device] is needed (i.e., whether all the time, periodically, or only in certain

situations; distance and terrain; and any other relevant information)."  SSR 96-9p, 61 Fed. Reg. 34478, 34482 (July 2, 1996).

As to the first requirement, SSR 96-9p calls for medical documentation of "the need for a hand-held assistive device to aid in walking or standing," not simply provider notations that a claimant was observed using an assistive device.  61 Fed. Reg. at 34482; *see Barnes v. Comm'r of Soc. Sec.*, No. 5:21-CV-01688-JDA, 2023 WL 2988346, at *8 (N.D. Ohio Mar. 22, 2023) (collecting cases) ("[T]he fact that various physicians noted Mr. Barnes' use of a cane or a walker does not establish that an assistive device was medically necessary for purposes of SSR 96-9p."); *Phillips v. Comm'r of Soc. Sec.*, No. 5:20-CV-01718-CEH, 2021 WL 5603393, at *10 (N.D. Ohio Nov. 30, 2021) ("Although various medical records note that Claimant presented at appointments using a cane, these notations do not meet the requirements of SSR 96–9p.").

As to the second requirement, SSR 96-9p calls for medical documentation "describing the circumstances for which [the device] is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)," not simply a prescription for a device.  61 Fed. Reg. at 34482; *see Barnes*, 2023 WL 2988346, at *8 (collecting cases).  This is consistent with the Seventh Circuit's holding that SSR 96–9p requires an "unambiguous opinion from a physician stating the circumstances in which an assistive device is medically necessary."  *Tripp v. Astrue*, 489 F. App'x 951, 955 (7th Cir. 2012); *see also Spaulding v. Astrue*, 379 F. App'x 776, 780 (10th Cir. 2010) ("[T]he legal issue does not turn on whether a cane was 'prescribed' for Spaulding, but whether a cane was 'medically required.'); *Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) (finding prescription and references to use of cane without discussion of medical necessity to be insufficient to show medical necessity).

36

Ms. Grohl argues that a medical necessity finding was required in this case based on the following medical records:

- A May 18, 2023 primary care office visit note from Dr. Mahdi with the following notations: "Mobility and gait problems unsteady"; "Recommend a cane"; "Walker with a seat to help with activity of daily living and shopping and improve quality of life. And fall prevention"; "Had 2 falls in the last 3 months."; "Also need shower chair to help showering safely."  (Tr. 1243.)

- Prescriptions from Dr. Mahdi in the May 2023 office visit note for: "Cane, Adjustable" and "Walker Rollator Seat With 6" Wheels – Red" (Tr. 1244);

- Examination findings from a September 22, 2023 office visit with Dr. Mahdi noting: "Gait abnormal (uses walker)" (Tr. 1229); and

- An October 7, 2023 radiology note saying she is a "High Risk for Falls" (Tr. 1222).

(*See* ECF Doc. 7, p. 18 (citing Tr. 1222, 1229, 1243-44).)  The Commissioner argues in response that this evidence is insufficient to support a medical necessity finding because the relevant medical documentation does not meet the second requirement of SSR 96-9p by "describing the circumstances for which [the device] is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)."  SSR 96-9p, 61 Fed. Reg. 34478, 34482.  (*See* ECF Doc. 9, pp. 15-16.)

Although her argument is not clearly articulated, Ms. Grohl appears to assert in her reply brief that the second requirement of SSR 96-9p is met by Dr. Mahdi's notation in May 2023 that the walker was intended "to help with activity of daily living and shopping and improve quality of life. And fall prevention."  (ECF Doc. 10, p. 2 (citing Tr. 1243-44).)  Although this notation does suggest some uses and benefits that Dr. Mahdi may have anticipated when prescribing the walker, it is not a clear statement of "the circumstances for which [the device] *is needed* (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)."  SSR 96-9p, 61 Fed. Reg. at 34482 (emphasis added).  While a walker may be helpful in performing a number of activities, the question before this Court is

whether the record contains "medical documentation" that describes the specific circumstances in which Ms. Grohl *needs* to use a walker.

Given the absence of an "unambiguous opinion ... stating the circumstances in which [the] assistive device is medically necessary," the undesigned concludes that Ms. Grohl has failed to show that the ALJ lacked substantial evidence to support his conclusion that the assistive devices were not medically necessary. *Thacker v. Comm'r of Soc. Sec.*, No. 3:21 CV 1617, 2022 WL 3369533, at *3 (N.D. Ohio Aug. 16, 2022) (quoting *Tripp*, 489 F. App'x at 955); *see also Barnes*, 2023 WL 2988346, at *8 (collecting cases) ("Mr. Barnes has failed to identify any records describing the precise circumstances in which an assistive device was medically necessary and has thus not met the requirements of SSR 96-9p.").

For the reasons set forth above, the undersigned concludes that the ALJ's adoption of an RFC that did not require the use of an assistive device was supported by substantial evidence. Accordingly, the undersigned finds Ms. Grohl's third assignment of error is without merit.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.


January 21, 2026                         */s/Amanda M. Knapp*
                                         AMANDA M. KNAPP
                                         United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).